Brian O'Mara (Cal. Bar. No. 229737)
**DICELLO LEVITT LLP**
4747 Executive Dr., Suite 240
San Diego, CA 92121
Telephone: (619) 923-3939
briano@dicellolevitt.com

Adam J. Levitt (*pro hac vice* forthcoming)
Amy Keller (*pro hac vice* forthcoming)
Daniel R. Schwartz (*pro hac vice* forthcoming)
James A. Ulwick (*pro hac vice* forthcoming)
**DICELLO LEVITT LLP**
Ten North Dearborn St., Sixth Floor
Chicago, IL 60602
Telephone: (312) 214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
dschwartz@dicellolevitt.com
julwick@dicellolevitt.com

*Counsel for Plaintiff and the Putative Class
and Subclass*

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CLAUDIA JAYNE YOUNG, Individually and on Behalf of All Others Similarly Situated, ) <br><br> Plaintiff, ) <br><br> vs. ) <br><br> PAYPAL, INC. and PAYPAL HOLDINGS, INC., ) <br><br> Defendants. ) x | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMAND** |

Plaintiff, Claudia Jayne Young ("Plaintiff"), individually and on behalf of all other members of the below-defined class (the "Class"), upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief, based upon the investigation made by her attorneys, alleges as follows:

## INTRODUCTION

1.  Through a simple and incredibly effective scheme, PayPal has, for years, been systematically stealing affiliate marketing commissions from individuals who have built businesses, online personas, and advertising relationships to make a living.

2.  Affiliate marketing is a form of online advertising where content creators, such as bloggers, podcasters, or influencers (hereinafter "Affiliate Marketers"), promote products or services of e-commerce merchants, such as online retailers (hereinafter "Merchants"), and receive a commission for each sale generated through their referral links.

3.  Plaintiff Claudia Jayne Young is such an affiliate marketer. She has a following on the social media platform Instagram and occasionally promotes certain products sold by a variety of Merchants, such as Amazon.com. When one of Plaintiff's followers clicks a link—typically a hyperlink on an Instagram "Story"—and is redirected to a Merchant and then completes a sale, Plaintiff will receive a commission for that sale. Commissions for some Affiliate Marketers can be as high as 40% of the sale.

4.  The way the Merchants typically understand who is owed that commission is through the placement of a "cookie"—a short piece of code placed on the user's web browser when the user clicks the referral link. The cookie contains a unique Affiliate ID, specifically identifying to whom, for a given sale, the Merchant should provide a commission. The cookie is the Affiliate Marketer's lifeblood: without it, even if an Affiliate Marketer convinces a user to make a large purchase, the Affiliate Marketer will not be paid.

5.  PayPal, Inc. recognizes the value of those Affiliate Marketer cookies. So much so that it steals them.

6.  In March 2020, PayPal purchased a popular web browser extension called Honey

for $4 billion. At the time of PayPal's 2020 purchase of Honey, PayPal had approximately 300 million active users, and Honey had approximately 17 million active users.[1]  Recent estimates have found that Honey is installed on more than 20 million Google Chrome web browsers alone, making it the twelfth most popular extension for the Chrome browser.[2] As one technology blog described it at the time, PayPal's purchase of Honey was "PayPal's largest to date [and] will give the payments giant a foothold earlier in the customer's shopping journey. Instead of only competing on the checkout page against credit cards or Apple Pay, for example, PayPal will leap ahead to become a part of the deal discovery process as well."

7.    The Honey extension—popularized through its advertising relationship with popular social media stars like James "Jimmy" Donaldson, aka Mr. Beast—claims to help customers find and apply promotional codes at checkout for participating merchants, and to reward users with cash back or gift cards for their purchases.

8.    When a customer who has installed Honey is about to purchase a product, he or she can ask Honey to search for coupons. Since it is a web browser extension, Honey is always visible to the user, right on the task bar at the top of the user's web browsing page. If there are coupons, the coupons will be applied.[3]

9.    While there has existed some speculation regarding how Honey makes money—it was mysterious to many how a browser extension that was free to install and that searched for free-to-use coupons was profitable, much less worth $4 billion—Honey claims on its webpage to make money through "commissions from…merchant partners."[4]

10.    What Honey does not make clear—and what, until recent bombshell reporting,

---

[1]    PayPal to Acquire Honey, PayPal Newsroom (Nov. 20, 2019), https://newsroom.paypal-corp.com/2019-11-20-PayPal-to-Acquire-Honey.

[2]    Matt Zeunert, Chrome Extension Statistics: Data from 2024, DebugBear (Aug. 29, 2024), https://www.debugbear.com/blog/chrome-extension-statistics.

[3]    Sarah Perez, PayPal to acquire shopping and rewards platform Honey for $4B, TechCrunch (Nov. 20, 2019), https://techcrunch.com/2019/11/20/paypal-to-acquire-shopping-and-rewards-platform-honey-for-4-billion/.

[4]    How does Honey make money?, PayPal Honey (Nov. 25, 2024), https://help.joinhoney.com/article/30-how-does-honey-make-money.

3

CLASS ACTION COMPLAINT

remained unknown—was that Honey's business is built around stealing those commissions from Affiliate Marketers like Plaintiff and the other Class members.

11.    The theft is incredibly simple: when a user uses Honey to search for coupons, Honey will *replace the affiliate marketer's cookie with its own*, effectively taking full credit and any resulting commission from the sale. Honey does this even where it has not found a coupon for the user at all—the simple act of clicking a button affiliated with Honey will cause Honey to place its own affiliate marketing cookie in the place of the affiliate marketer cookie that actually led the user to the purchase. PayPal also has created a program of "PayPal Rewards" which, if activated at checkout, will similarly lead to the replacement of the affiliate marketer's cookie with PayPal's.

12.    Plaintiff uses affiliate marketing to earn money, and PayPal is building its multi-billion dollar business by leveraging Plaintiff's and the other Class members' work for its own benefit, swooping in at checkout to steal the fruits of the Class's labor.

13.    Plaintiff, individually and on behalf of the other Class members, accordingly files this claim for damages and injunctive relief, seeking an immediate end to PayPal's abusive practices and for recompense for the harm that has already been done.

**PARTIES**

14.    Plaintiff Claudia Jayne Young is a resident of Washington County, Arkansas. She is a content creator on Instagram who earns commission payments from affiliate marketing agreements relating to stories she shares on Instagram. She regularly partners with businesses, including Defendant's merchant partners, such as Amazon.com, to promote products.

15.    Defendant PayPal Holdings, Inc. is a Delaware corporation and holds all assets and liabilities of PayPal, Inc., a subsidiary Delaware corporation. PayPal transacts business in this district and is headquartered at 2211 North First Street, San Jose, California 95131. The two entities are collectively referred to as "PayPal."

16.    In addition, PayPal owns and operates Honey, aka the Honey Science Corporation, which had originally developed the Honey browser extension. Honey was purchased by PayPal in 2020. The term "PayPal" shall encompass Honey, unless otherwise noted.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because this is a class action involving more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the class is a citizen of a state different from Defendants.

18.     This Court has personal jurisdiction over Defendants because they conduct substantial business in this District, have purposefully availed themselves of the benefits and privileges of conducting business in this District, are headquartered in the district, and have caused harm to Plaintiff and class members as a direct result of actions they take in this District.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendants are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### The Affiliate Marketing Model

20.     Affiliate marketing is a form of online advertising where content creators, such as bloggers, podcasters, or influencers, promote products or services of e-commerce Merchants, such as online retailers, and receive a commission for each sale generated through their referral links. Plaintiff is such a content creator.

21.     It is a massive market. According to one estimate, in 2023 referral marketing spending in the United States alone was approximately $9.56 billion, with likely spending of up to 15.8 billion by 2028. [5]

---

[5]     Affiliate Marketing 101: What it is and How to Get Started, Big Commerce Team (Dec. 20, 2024), https://www.bigcommerce.com/articles/ecommerce/affiliate-marketing/.



22.    Sales attributable to Affiliate Marketers are typically tracked through affiliate marketing cookies and/or tracking links. A cookie is a small text file that tracks a user's activity after clicking an affiliate marketer's link. The cookie stores information about the referring affiliate marketer—e.g., the influencer—and is used to determine whether a user makes a purchase. If the user does, the affiliate marketer typically receives a commission.

***The Honey Browser Extension***

23.    The Honey browser extension is an add-on compatible with nearly every major web browser. Adding it to the web browser is simple: for example, a user of the popular Google Chrome browser need only click "Add to Chrome," and the extension will be added:



CLASS ACTION COMPLAINT

24. Once added, Honey becomes an "extension" of the browser, meaning that it can add/change information for the user—e.g., install cookies or so-called "tracking tags" on the website.



25. When a user shops, the Honey extension will automatically search for and apply coupons. Honey provides the following explanation to users who newly install the app:

***Honey's Theft of Affiliate Marketing Cookies***

26. While Honey is purportedly providing users with "free" coupons, it is doing so at the expense of Affiliate Marketers like Plaintiff and other Class members.

27. A recent expose revealed Honey's actions in stark detail.[6]

28. Using what is often referred to as the "developer mode" of a web browser, the



---

[6] MegaLag, Exposing The Honey Influencer Scam (Dec. 21, 2024), https://www.youtube.com/watch?v=vc4yL3YTwWk.

CLASS ACTION COMPLAINT

investigation studied network traffic for browsers with a Honey extension installed, and followed, click by click, as Honey stole an affiliate marketer's cookie. Honey uses two nested strategies to steal Affiliate Marketers' referrals.

***The Search for Coupons***

29.    First, by Honey's design, whenever a user uses Honey to search for a coupon, Honey will treat that search as authorization to overwrite an affiliate marketer's cookie. One investigation navigated a web browser to a popular tech YouTuber's website, choosing an influencer who goes by the moniker "Linus Tech Tips." (Linus Tech Tips has approximately 16 million YouTube subscribers).  On the YouTube channel were links that the channel provided to various pieces of computer hardware the channel was promoting:



Check out the Herd Mentality PC:
Intel Core i7 12700K CPU: https://geni.us/sWg2
MSI Pro Z690-A WiFi Motherboard: https://geni.us/gRnjoP
ASUS TUF Gaming NVIDIA RTX 4070 Ti OC Graphics Card: https://geni.us/qnMSYsL
Fractal Meshify 2 ATX Mid Tower Case: https://geni.us/WzeTy3
Seasonic Vertex GX-1000 1000W 80+ Gold PSU: https://geni.us/pmw2TO
Samsung 970 Evo Plus 1TB M.2 NVMe SSD: https://geni.us/vXKXjv

30.    The investigator clicked on the link, highlighted in blue, corresponding to the item labeled "Intel Core i7 12700K CPU."

31.    Having clicked on that item, the investigator was re-directed to a Merchant page where the Intel Core i7 12700K CPU was being sold. In the URL there appeared a "tracking tag" labeled "Short Circuit," a reference to one of the YouTube channels for Linus Tech Tips, whose link led to the potential sale. A portion of the url, with the tracking tag, is here:



d3xpyre0if6&utm_source=howl-LMG%20-%20ShortCircuit&utm_medium=affil

32.    The tracking tag was also saved on the investigator's browser in the form of a "cookie," labeled "afc-howl-shortcircuit," set to expire in 30 days:



33.     The reason for the 30-day expiration is simple: if a user ultimately decides to complete the purchase a few days after clicking the affiliate marketing link from the Linus Tech referral, Linus Tech would still get the credit.

34.     The investigator, however, had purposefully installed Honey on the browser he was using. When he used Honey to check for discounts, he noted that the Linus Tech cookie had been replaced. Honey removed the Linus Tech affiliate cookie, and replaced it with its own PayPal cookie:



35.     As a result, PayPal would be able to ensure that, instead of Linus Tech being paid a commission, PayPal would get the entirety of the commission money themselves.

36.     The investigator revealed that this cookie theft would occur *even if Honey did not find any discounts for the product sought*.  In that case, the pop-up would reveal that Honey "searched" but "didn't find any deals" and have a button that says "Got it!":



37.     Clicking that button that says "Got it!" will, likewise, lead to PayPal replacing the affiliate marketer's cookie with its own, and taking the commission for the sale.

38.     Finally, Honey will occasionally pop up, have nothing to offer, and then provide the option to check out with PayPal:



39.     This option may even be displayed where PayPal is *already* an option that could be used for payment at checkout. However, clicking on the PayPal checkout button provided by Honey will, again, lead to the replacement of an affiliate marketer's cookie with PayPal's, leading PayPal to poach the sale commission.

40.    The investigator reached out directly to PayPal and asked whether Honey was, indeed, replacing cookies from Affiliate Marketers with its own cookie. PayPal admitted that it is—responding: "If Honey is activated and is the last program used while shopping on a site, it is likely Honey will receive credit for the purchase."

***Rewards Program***

41.    Next, Honey also uses a purported Rewards program to fight for the "last click attribution," the term of art for the affiliate marketer who should be credited with a customer's purchase (i.e., the marketer who inspired the "last click" that led to the sale).



42.    Now called PayPal Rewards (formerly Honey Gold), PayPal has partnered with what it claims to be approximately 1500 retailers to allow users to get "PayPal Rewards Points" when they make purchases.

43.    In other words, even when there are no coupons, Honey will sometimes provide the user with "cash back" in the form of PayPal points. An example of the PayPal rewards landing page, which will pop up at checkout, was provided on Honey's website:[7]

---

[7]    What are PayPal Rewards, Join Honey, https://help.joinhoney.com/article/34-what-are-paypal-rewards (last accessed Jan. 3, 2024).

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8



9    44.    Sure enough, activating the PayPal Rewards will similarly lead to the replacement

10   of an affiliate marketer's link with a PayPal link; i.e., another way in which PayPal will take an

11   affiliate marketer's commission.

12   45.    One affiliate marketer went so far as to prove the use of PayPal Rewards to steal

13   affiliate commissions through separate transactions. A popular YouTube channel called MegaLag

14   successfully received an affiliate relationship with a company called NordVPN. NordVPN will

15   provide an approximately 40% commission to purchases made through an affiliate sponsor's link.

16   The investigator then made two purchases of the same NordVPN product. Using a browser with

17   "cookies cleared" he purchased NordVPN after clicking on his own affiliate link, but without

18   clicking the Honey browser extension's "Activate Cash Back" button. Then, using another

19   separate browser session with cookies cleared, he purchased NordVPN after clicking his own

20   affiliate link, but pressing the button to "Activate Cash Back."

21   46.    On the first session—i.e., when Honey was not activated—he received a

22   commission of $35.60, the appropriate 40% commission. On the second session—where he clicked

23   "Activate Cash Back"—he received nothing for the affiliate commission. As for the value of that

24   "cash back": the investigator received the equivalent in PayPal Rewards of $0.89 in cash back for

25   the transaction, with PayPal pocketing the rest of the $35.60 commission.

26   47.    A follow-up investigation confirmed the online report, and was able to re-create the

27   same cookie theft. The investigation sought to determine whether applying PayPal Honey Gold

28

CLASS ACTION COMPLAINT

rewards does indeed lead to the replacement of an affiliate marketer's cookie (necessary to provide a commission to that affiliate marketer) with a PayPal cookie. It does.

48.     Upon arrival on the NordVPN website via an affiliate link, the value for both the "aff_id" and "nordvpn_aff_id" cookie was "60397"—an apparent identifier of the affiliate marketer.

49.     While moving through the checkout process for a vpn service on that website, with the Honey browser extension installed, a pop-up from the Honey browser extension indicated "Rewards found!" and offered a button to "Activate Rewards".

50.     Prior to clicking on "Activate Rewards," the "aff_id," and "nordvpn_aff_id" cookie values remained "60397."



51.     Once the "Activate Rewards" button was clicked, however, the browser window was reloaded and sent back to the front page of the NordVPN website, and the "aff_id" and "nordvpn_aff_id" cookie values changed to "2495."

52.    On information and belief, this cookie change represented the replacement, by PayPal, of the affiliate marketer's tracking cookie with a PayPal cookie, to ensure that PayPal would receive the commission for the sale. The irony of course is that Honey has made a practice of promoting itself by partnering with online influencers like famous YouTube personalities, racking up hundreds of millions of impressions on those influencers' websites. At the same time, Honey's core business practice is to steal commissions from those very influencers.

***The Named Plaintiff Has Been Victimized by PayPal's Scheme***

53.    Plaintiff Claudia Jayne Young has an Instagram account for which she creates online content and, for a portion of her revenue, earns commissions from affiliate marketing links placed on her account. She partners with businesses, including Defendant's merchant partners, such as Amazon.com, through the Amazon Influencer program, to promote products.

54.    While Plaintiff's Instagram following has grown over 180% over the past two years, her income from affiliate marketing has remained flat. Given the growth of her following, she would have expected affiliate marketing commissions to grow as well. However, on information and belief, consumers' use of PayPal's Honey browser extension has led to the diversion of commissions away from Plaintiff, and to PayPal, instead.

55.    PayPal's Honey browser extension has deprived her of earnings she rightfully earned through her affiliate marketing links. As a direct and proximate result of PayPal's conduct

1  described herein, Plaintiff suffered economic injury by being deprived of commissions she should

2  have earned through affiliate marketing commissions.

3                              **CLASS ACTION ALLEGATIONS**

4        56.    Plaintiff brings this action on behalf of herself and on behalf of all natural persons

5  and corporations similarly situated, referred to throughout this Complaint as "Class members."

6  Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal

7  Rules of Civil Procedure on behalf of herself and all others similarly situated.

8        57.    Plaintiff seeks to represent the following class and subclass:

9        **Nationwide Class**: All U.S. based Affiliates whose affiliate commissions from United

10       States e-commerce merchants were diverted to PayPal as a result of the Honey browser

11       extension (the "Class").

12       **Arkansas Subclass**: All Arkansas-based Affiliates whose affiliate commission from

13       United States e-commerce merchants were diverted to PayPal as a result of the Honey

14       browser extension (the "Subclass").

15       58.    Excluded from the Class and Subclass (collectively the "Class") are the Defendants,

16  and any of the Defendants' members, affiliates, parents, subsidiaries, officers, directors,

17  employees, successors, or assigns; the judicial officers, and their immediate family members; and

18  Court staff assigned to this case.  Plaintiff reserves the right to modify or amend the Class

19  definition, as appropriate, during the course of this litigation.

20       59.    This action has been brought and may properly be maintained on behalf of the Class

21  proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

22       60.    Certification of Plaintiff's claims for classwide treatment is appropriate because

23  Plaintiff can prove the elements of her claims using the same evidence as would be used to prove

24  those elements in individual actions alleging the same claims.

25       61.    **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of the

26  Class are so numerous and geographically dispersed that individual joinder of all Class members

27  is impracticable. Plaintiff is informed and believes that there are tens of thousands, if not hundreds

28

of thousands, of Class members. While the precise number of Class members is presently unknown to Plaintiff, based on PayPal's own statements, there are more than 30,000 "participating" Merchants who may be providing commissions to PayPal instead of to the Class members who earned those commission. The Affiliates injured by this conduct may be ascertained from Defendants' books and records.

62.   **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**. Defendants have acted in a manner generally applicable to Plaintiff and each of the other Class members. There is a well-defined community of interest in the questions of law and fact involved, in that Plaintiff's and other Class members' affiliate link-driven commissions at issue were similarly usurped by PayPal through the Honey browser extension. The common issues arising from Defendants' conduct affecting Class members, as described *supra*, predominate over any individualized issues. Adjudication of the common issues in a single action has important and desirable advantages of judicial economy.

63.   There are questions of law and fact common to the Class and Subclass, which predominate over any individual questions. These common questions include, but are not limited to:

a.   Whether PayPal's Honey browser extension was knowingly designed to replace the cookies of Class members with PayPal cookies;

b.   Whether PayPal's Honey browser extension in fact replaced the cookies of Class members with PayPal cookies;

c.   Whether as a result of PayPal's actions PayPal has been awarded commissions that rightfully should belong to members of the Class;

d.   Whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, punitive damages, exemplary damages, and/or other relief;

e.   Whether PayPal has been unjustly enriched to the detriment of Class members; and

f.      Whether Plaintiff and the other Class members are entitled to declaratory, injunctive, or monetary relief, and if so, in what amount and form.

64.      **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because Plaintiff's affiliate links, like those of every Class member, were usurped by PayPal through the Honey browser extension. Plaintiff and the other Class members suffered damages as a direct proximate result of the same wrongful practices in which PayPal engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the other Class members' claims.

65.      **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4)**. Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other Class members who she seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiff and her counsel.

66.      **Superiority—Federal Rule of Civil Procedure 23(b)(3)**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against PayPal, so it would be impracticable for the members of the Class to individually seek redress for PayPal's wrongful conduct. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for the PayPal, particularly with regard to how the Honey browser extension is permitted to work going forward. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

67.     **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2)**. PayPal acted or refused to act intentionally and uniformly with regard to Plaintiff and all other Class members, and are continuing to do so, thereby making declaratory relief appropriate, with respect to each Class as a whole. Plaintiff also seeks to represent the Class under Rule 23(b)(2) to obtain final injunctive relief forcing PayPal to cease its ongoing illegal practice of stealing affiliate marketer commissions.

68.     **Issue Certification—Federal Rule of Civil Procedure 23(c)(4).** As an alternative to Rule 23(b)(2) and/or 23(b)(3), Plaintiff seeks issue certification under Rule 23(c)(4) of liability issues common to all Class members.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
**Tortious Interference with Prospective Economic Advantage**
**(On Behalf of the Nationwide Class)**

69.     Plaintiff, individually and on behalf of others similarly situated, incorporates by reference all preceding paragraphs as if fully set forth herein.

70.     Plaintiff and other Class members are regularly engaged in an economic relationship with Merchants. They send their followers to the Merchants through affiliate links, and in return, the Merchants pay to Plaintiff and other Class members referral fees/commissions.

71.     PayPal has knowledge of that economic relationship.

72.     Through the Honey browser extension, PayPal directly and purposefully interfered and continues to interfere with the economic relationship between Merchants, on the one hand, and Plaintiff and other Class members, on the other. PayPal purposefully and unlawfully replaces the tracking tags necessary for the Plaintiff and other Class members to be paid commissions and in their place substitutes its own tracking tags to take the commission for itself.

73.     As a direct and proximate result of PayPal's interference, Plaintiff and other Class members have suffered actual damages, including, but not limited to, the loss of commissions earned as the actual originator of sales.

74.     Plaintiff and other Class members are entitled to recover their actual damages,

consequential damages, punitive damages, injunctive relief, attorneys' fees, costs, and any other relief that the Court deems appropriate.

**SECOND CLAIM FOR RELIEF**
**Conversion**
**(On Behalf of the Nationwide Class)**

75.    Plaintiff, individually and on behalf of others similarly situated, incorporates by reference Paragraphs 1 through 68 as if fully set forth herein.

76.    By virtue of their referrals of consumers to products and services offered by Merchants, Plaintiff and other Class members acquired or were entitled to acquire commissions of specific and ascertainable amounts.

77.    Plaintiff and the other Class members had a right or interest in commissions of concrete, readily identifiable sums, which they earned from referring Customers to Merchants' products and services, after those Customers made purchases from the Merchants.

78.    PayPal intentionally and substantially interfered with Plaintiff's and Class members' personal property by causing its Honey browser extension to replace the cookie associated with Plaintiff and other Class members with its own cookie, thereby receiving commissions and referral fees owed to Plaintiff and the other Class members.

79.    Through its Honey browser extension, PayPal assumed and exercised the right of ownership over these commissions without justification or authorization.

80.    PayPal's wrongful exercise of control over Plaintiff's and other Class members' personal property constitutes conversion.

81.    As a direct and proximate result of PayPal's conversion, Plaintiff and other Class members were harmed, and will continue to be harmed by PayPal's ongoing conduct through the Honey browser extension.

82.    Plaintiff and other class members are entitled to recover damages and costs permitted by law, and to injunctive relief to halt future conversion by PayPal through its ongoing conduct.

**THIRD CLAIM FOR RELIEF**
**Violation Of California Business And Professions Code §17045**

83.    Plaintiff, individually and on behalf of others similarly situated, incorporates by reference Paragraphs 1 through 68 as though fully set forth herein.

84.    Section 17045 prohibits the "secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extending to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition."

85.    By secretly and unlawfully replacing Plaintiff and other class members' affiliate marketing cookies with their own, PayPal ensured that it would be paid "secret…commissions" by Merchants, to the detriment of competition.

86.    This payment of secret commissions has directly harmed Plaintiff and other Class members, since the secret commissions themselves represent the diversion of Plaintiff and other Class members' earnings to PayPal. Such secret payment of commissions, to the direct detriment of PayPal's competitors in affiliate marketing, is injurious to PayPal's competitors including Plaintiff and other Class members, "tends to destroy competition," and is unlawful.

**FOURTH CLAIM FOR RELIEF**
**Violation of California's Unfair Competition Law**
**California Business and Professions Code §17200**

87.    Plaintiff, individually and on behalf of others similarly situated, incorporates by reference Paragraphs 1 through 68 as though fully set forth herein.

88.    The California Unfair Competition Law "UCL" forbids an "unfair competition," which is defined to include any "unlawful, unfair, or fraudulent" act or practice. Cal. Bus. & Prof. Code §17200.

89.    Defendants (collectively, PayPal) are each a "person" within the UCL's definition, which includes any "natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." Cal. Bus. & Prof. Code §17201. PayPal is

headquartered in California and the acts which precipitate the claim for violation of the Unfair Competition Law emanate from its actions in California.

90.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

91.    Defendants' actions, as described herein, violate multiple laws, including at least CA Bus. & Prof. §17045 and the laws prohibiting conversion and interference with prospective economic advantage.

92.    In addition, a business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

93.    Defendants' actions constitute "unfair" business practices because, as alleged above, Defendants engaged in the immoral, unethical, oppressive, anticompetitive, and unscrupulous practices whereby they stole Plaintiff and other Class members' affiliate marketing commissions through underhanded tactics described herein.

94.    Defendants' actions are continuing, and there is no indication that Defendants will cease their activity any time in the future.

95.    At the time of filing this complaint, Plaintiff has served Defendants with a demand letter seeking an injunction, restitution, and all other appropriate relief in equity, including reasonable attorneys' fees and costs of suit. This complaint will be amended at a later time after the requisite statutory period for a response has expired.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Arkansas Deceptive Trade Practices Act**
**Ar Code §4-88-107 Et Seq.**
**(Arkansas Subclass)**

96.    Plaintiff, individually and on behalf of others similarly situated, incorporates by reference Paragraphs 1 through 68 as if fully set forth herein.

97.    Arkansas' Deceptive Trade Practices Act, AR Code §4-88-107(a) ("ADTPA"), defines "[d]eceptive and unconscionable trade practices made unlawful" to include "[e]ngaging in any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade" or

"[k]nowingly facilitating, assisting, intermediating, or in any way aiding the operation or continuance of an act or practice that is in violation" of the act. AR Code §4-88-107(a)(11)-(12).

98.    PayPal has engaged in acts and practices that are false and deceptive in violation of the ADTPA.

99.    As a "person" defined by AR Code §4-88-102, PayPal's business acts and practices are unlawful because they unconscionably, falsely, or deceptively induce Customers into causing the replacement of referral cookies during the checkout process, resulting in the Honey browser extension replacing the Affiliate's referral cookie with its own, as set forth above, directly harming Plaintiff and other Class members.

100.    PayPal has also unjustly enriched itself for the reasons stated above.

101.    PayPal committed unconscionable, false, and deceptive business practices by using the Honey browser extension to steal credit for sales referrals, receiving commission payments that rightfully belong to Plaintiff and the other Arkansas Subclass members.

102.    PayPal wrongfully deprived, and continues to deprive, Plaintiff and other Arkansas Subclass members of monies they rightfully earned as the true originators of sales arising from their affiliate marketing links. The gravity of harm resulting from PayPal's practices of unconscionably, falsely, and deceptively appropriating commissions that belong to online marketers like Plaintiff and the other Arkansas Subclass members outweighs any potential utility therefrom.

103.    PayPal's conduct set forth in this Complaint violates public policy and is an insidious, unconscionable injury.

104.    PayPal actually and proximately caused the Plaintiff and other Subclass members economic harm by depriving them of commissions they should have earned from referrals through their affiliate links. The conduct alleged herein is continuing and there is no indication that PayPal will cease such activity in the future, absent an order from this Court.

105.    PayPal's conduct in violation of the ADTPA has caused Plaintiff and the other Subclass members to be deprived of referral fees and commission payments for sales they

rightfully originated. Plaintiff and the other members of the Arkansas Subclass thus suffered lost money or property as a result of Defendants' conduct.

106.    Plaintiff and the Arkansas Subclass therefore seek restitution, an injunction, and all other appropriate relief in equity, including reasonable attorneys' fees and costs of suit.

## SIXTH CLAIM FOR RELIEF
### Unjust Enrichment

107.    Plaintiff, individually and on behalf of all others similarly situated, incorporates by reference paragraphs 1 through 68 as though fully set forth herein.

108.    Plaintiff and other Class members lack a fully adequate remedy at law.

109.    Plaintiff and other Class members have an interest, both legal and equitable, in the commission payments wrongfully taken by Defendants.

110.    Defendants have been unjustly enriched by the referral fees and commission payments that they took when they wrongfully took credit for commissions that should have been paid to plaintiff and other Class members. Defendants continue to benefit from their wrongful behavior, and profit through their use of the Honey extension to the clear detriment of Plaintiff and other Class members. The diversion of commissions is ongoing, and each such diversion harms a member of the class and enriches Defendants. But for Defendants' wrongful use of the Honey browser extension, Plaintiff and other Class members would not have had their commission payments diverted.

111.    It would be inequitable for Defendants to retain the benefit of their wrongdoing.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class and Subclass members, respectfully requests that the Court:

A.    Certify this action as a class action, appoint Plaintiff as class representative, and appoint her counsel as Class Counsel;

B.    Declare that Defendants' conduct, as alleged herein, violates the laws of the states where Plaintiff and the other Class members reside;

C.    Enjoin Defendants from continuing or engaging in the unlawful conduct alleged

herein, and require them to disclose and correct, or cease, their deceptive practices;

D.      Award Plaintiff and the other Class members actual, statutory, treble, punitive, and consequential damages, in an amount to be determined at trial;

E.      Order Defendants to disgorge and/or restore all funds, revenues, and benefits obtained from Plaintiff and the other Class members as a result of their unlawful conduct;

F.      Award Plaintiff and the other Class members pre-judgment and post-judgment interest, as allowed by law;

G.      Award Plaintiff and the other Class members reasonable attorneys' fees, costs, and expenses, as allowed by law or equity; and

H.      Grant Plaintiff and the other Class members all other relief that the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury for all claims so triable.

DATED:  January 3, 2025

*s/* BRIAN O. O'MARA
BRIAN O. O'MARA

Brian O'Mara (Cal. Bar. No. 229737)
**DICELLO LEVITT LLP**
4747 Executive Dr., Suite 240
San Diego, CA 92121
Telephone: (619) 923-3939
briano@dicellolevitt.com

Amy Keller (*pro hac vice* forthcoming)
Daniel R. Schwartz (*pro hac vice* forthcoming)
James Ulwick (*pro hac vice* forthcoming)
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, IL  60602
Telephone: (312) 214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
dschwartz@dicellolevitt.com
julwick@dicellolevitt.com

*Counsel for Plaintiff and the Putative Class and Subclass*